UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

RHONDA COOPER,

       Plaintiff,

  v.

BURGER KING CORPORATION, a Florida
corporation, d/b/a BURGER KING,

       Defendant.

Case No._____

**CLASS ACTION**

**JURY TRIAL
DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiff Rhonda Cooper brings this action, individually and on behalf of all others similarly situated, against Defendant Burger King Corporation. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## <u>NATURE OF THE CASE</u>

1.     Plaintiff brings this class action lawsuit on behalf of herself and similarly situated consumers throughout the United States of America ("Class Members") who purchased for personal, family or household use certain food products ("Products")[1] which are unfit for their intended use because they contain unsafe per- and polyfluoroalkyl substances ("PFAS").

2.     The Products are formulated, designed, manufactured, advertised, distributed, prepared, sold, and delivered by Defendant to consumers, including Plaintiff, throughout the United States.

3.     Defendant is one of the largest restaurants in America with annual sales of approximately $20 Billion.[2]

---

[1] Products as used herein means the food item as well as any and all containers, wrappers, and packaging used to package, seal, protect, or deliver the food item to the consumer. The action concerns all Burger King Products that contain PFAS, including but not limited to: the Whopper, Chicken Nuggets, Cookies, and French Toast. These particular Products have been independently tested and found to contain PFAS. Discovery will reveal the exhaustive list of substantially similar and defective Burger King products that are included in this action.

[2] *Revenues of Burger King 2013-2018*, STATISTIC, https://statstic.com/burger-king-revenue/.

1

4.      The first Burger King opened in Jacksonville, Florida in 1953. A year later, the company relocated to Miami, Florida.

5.      The Whopper is Burger King's best-selling product, and it is the best-selling hamburger in the United States with over a billion Whoppers sold each year.

6.      Unfortunately, each time an American buys a Whopper, they are exposed to high levels of PFAS.

7.      PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.

8.      PFAS are known as "forever chemicals" because the carbon-fluorine bonds in PFAS are extremely strong and thus are not appreciably degraded under environmental conditions. The continued use of PFAS is, by their nature, unsustainable, because it will necessarily lead to a greater concentration of PFAS in the environment. In some case, PFAS will survive over 1000 years.

9.      Exposure to PFAS can be incredibly devastating to vulnerable populations including young children and pregnant women. PFAS are capable of crossing the placenta, meaning pregnant women transfer PFAS to their unborn children. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections.

10.     Because PFAS persist and accumulate over time, they are harmful even at very low levels.

11.     Scientists are extremely concerned about how PFAS affect human health and how the risks may be underestimated. The CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

12.     Of particular concern is the use of PFAS in food product packaging because of the likelihood of migration into fast food.

13.     For example, foods that have high levels of sodium and fat – like Defendant's Products - have strong likelihoods of PFAS migration from the food product packaging.[4]

14.     The use of PFAS in its Products stands in stark contrast to Burger King's brand identity which espouses food safety. In almost every medium, Burger King tells consumers, investors, and the general public that the Products are safe.

15.     Defendant represents that the Products are safe and effective for their intended use, and reasonable consumers expect that Products marketed and sold to be ingested will not contain dangerous, synthetic chemicals like PFAS. Contrary to Defendant's representations, the Products are not safe because they contain PFAS, which have a negative impact on the health of humans.

---

[3] Harvard T.H. Chan Sch. of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/.

[4] Ramírez Carnero A, Lestido-Cardama A, Vazquez Loureiro P, Barbosa-Pereira L, Rodríguez Bernaldo de Quirós A, Sendón R., *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, FOODS 2021;10(7):1443. Published 2021 Jun 22.

16.    While consumers expect their food to be free of harmful toxins, Burger King goes further and represents: "Food safety is a top priority, and we dedicate substantial resources to ensure that our customers enjoy safe, high quality food products."[5]

17.    However, Defendant fails to tell consumers that PFAS, which can have adverse effects on humans and can bioaccumulate in human's bodies, are present in high levels in its Products. Even very low levels of PFAS can be toxic to humans.

18.    For the last three decades, Defendant's Products have been misleadingly represented, marketed, and advertised because Defendant failed to disclose the presence of PFAS in its Products. This failure to warn injured reasonable consumers, including Plaintiff, who reasonably relied upon Defendant's misleading representations that its Products were safe. Had Plaintiff and the putative Class Members known that Burger King's Products contained PFAS, they would not have purchased the products and/or would have paid less for them.

19.    Burger King is one of the largest restaurants in America.

20.    It has the resources to comply with its representations and produce a Product safe for consumption. However, it intentionally chooses to include PFAS in its Products in an effort to further boost profits by cutting costs while also increasing sales by concealing the presence of PFAS in its Products.

---

[5] Burger King's 2013 10K,
https://www.sec.gov/Archives/edgar/data/1547282/000119312514061827/d648966d10k.htm (filed Feb. 21, 2014).

4

21.     This "profits over people" approach allows Burger King to save pennies per unit sold, and instead pass these costs at a far greater rate onto generations of consumers that must live with the consequences of Burger King's willful inclusion and concealment of dangerous PFAS in Burger King's Products.

22.     The Products Plaintiff and Class Members purchased are either worthless or worth less than the purchase price because Defendant failed to disclose that they contain PFAS which are dangerous to the health of the consumer and to the environment. Plaintiff seeks damages and equitable remedies on behalf of herself and the proposed Class.

## PARTIES

23.     Plaintiff is a citizen of Okaloosa County, Florida. She has purchased Burger King Products – including the Whopper – on many occasions in the State of Florida. Most recently, in December 2021, she purchased the Products from a Burger King location in Destin, Florida.

24.     Defendant is a Florida corporation with its principal place of business in Miami, Florida.

## JURISDICTION AND VENUE

25.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the Florida consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the State of Florida, where the Products are purchased by thousands of

consumers every day. Further, Defendant's principal place of business is located within this district.

26.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

27.     Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant principal place of business is located in this District.

**FACTUAL ALLEGATIONS**

A.     **Burger King Tells Consumers Its Products Are Safe**

28.     Consumers inherently expect that food products are safe for consumption.

29.     Defendant goes further, and assures consumers that its Products are safe through a widescale marketing campaign and focused brand building.

30.      In almost every arena – from shareholder meetings to magazine features to advertising – Defendant prominently represents that it has effective systems that ensure its Products are safe.

31.      In fact, during the COVID-19 pandemic, Defendant claimed that its "restaurants are some of the safest places for guests to get food during this crisis."[6]

32.      Burger King gains consumer trust by telling the public, "Our focus on food safety extends throughout the preparation and delivery processes for serving food to our guests."[7]

33.      Moreover, it tells the public that "[f]ood safety is a top priority, and we dedicate substantial resources to ensure that our customers enjoy safe, high quality food products."[8]

34.      Burger King is known for its management and focus at every stage of the supply chain. It also purports to apply intensive food safety standards at each stage.

35.      Defendant understands that consumers are more concerned with safety and quality than value: "Many families and customers of all ages perceived that inexpensive hamburgers could not possibly be wholesome. We had to work hard to overcome that concern."[9]

---

[6] Restaurant Brands International's Official Website, *Food Safety*, https://www.rbi.com/English/sustainability/food-safety/default.aspx.
[7] *Id.*
[8] Burger King's  2013 10K, *supra* note 5.
[9] Jim McLamore, *The Burger King: A Whopper of a Story on Life and Leadership* (2020) at 138.

36.     In a recent SEC filing, Burger King puts a great emphasis on the safety and quality of its food and packaging. In fact, it is mentioned multiple times as being part of the company's purpose:[10]

    a.  "We establish the standards and specifications for most of the goods used in the development and operation of our restaurants and for the direct and indirect sources of supply of most of those items. These requirements help us assure the quality and consistency of the products sold at our restaurants and protect and enhance the image of the Burger King system and the Burger King brand."[11]

    b.  "[W]e approve the manufacturers of the food, packaging and equipment products and other products used in Burger King restaurants, as well as the distributors of these products to Burger King restaurants. Franchisees are generally required to purchase these products from approved suppliers and distributors. We consider a range of criteria in evaluating existing and potential suppliers and distributors, including food safety, product and service consistency, delivery timeliness and financial condition."

37.     This message is a core theme disseminated by Defendant to the public.

---

[10] Burger King's  2013 10K, *supra* note 5.

38.     From this long-term, widescale marketing focus, Burger King represents to consumers throughout the United States that its Products are safe at every stage.

**B.     Defendant's Products Contain High Levels of PFAS**

39.     Rather than delivering food safety in each Product, Defendant delivers Products that contain high levels of PFAS.

40.     Despite the multiple proclamations that Burger King's Products did not contain PFAS, numerous recent studies have shown the opposite.

41.     In 2020, Toxic Free Future tested Defendant's Products and found high levels of PFAS in the packaging for the Whopper, chicken nuggets, and cookies.[12]



---

[12] Jen Dickman, Erika Schreder, and Nancy Uding, *Packaged in Pollution: Are food chains using PFAS in packaging?*, TOXIC-FREE FUTURE, https://toxicfreefuture.org/packaged-in-pollution/.

42.     In 2022, Consumer Reports published a study that confirmed the presence of high levels of PFAS in Burger King's Products.[13]

43.     The study found high level of PFAS in the following items:



| Burger King | | |
|---|---|---|
| Bag for cookies, French toast sticks | ■ ■ | 345.7 |
| Wrapper for Whopper | ■ ■ | 249.7 |
| Bag for chicken nuggets | ■ ■ | 165.0 |

44.     The levels indicate the level of organic fluorine present in the item and is represented in parts per million (PPM).

45.     Notably, these Products are primarily the same items that were revealed to contain high levels of PFAS in the 2020 study.

46.     Burger King intentionally uses PFAS on its Products to increase profits through a combination of reduced costs by using lower cost packaging and increased sales by concealing the presence of PFAS.

47.     The presence of PFAS in the Products is material to Plaintiff and Class Members.

**C.     PFAS Are Toxic and Pose Substantial Health Risks to Humans and the Environment**

48.     PFAS are synthetic chemicals that do not exist naturally in the environment. They have been used for decades in industrial processes and to produce consumer, household, and commercial products.

---

[13] Kevin Loria, *Dangerous PFAS Chemicals Are in Your Food Packaging*, CONSUMER REPORTS (Mar. 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074.

49.     PFAS are "long lasting chemicals, components of which break down very slowly over time."[14]

50.     "One common characteristic of concern of PFAS is that many break down very slowly and can build up in people, animals, and the environment over time.[15]

51.     Humans are more efficient at processing PFAS than the environment – which can take over 1,000 years to eliminate.

52.     While more efficient, it can still take multiple years to completely excrete long-chain PFAS and months to completely excrete short-chain PFAS.[16]

53.     As a point of comparison, consumers are concerned about the presence of bisphenol-a (BPA) in consumer products which is fully excreted in a few *hours*.[17]

54.     Consumer products manufactured with PFAS were often promoted as being resistant to heat and stains, long-lasting, and capable of repelling water, oil, and grease. Companies have utilized PFAS to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

55.     Although there are thousands of unique PFAS in existence, the details of many of these compounds are proprietary and known only to manufacturers and

---

[14] PFAS Explained, EPA, https://www.epa.gov/pfas/pfas-explained.

[15] Our Current Understanding of the Human Health and Environmental Risks of PFAS, EPA, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.

[16] Nicole W., *Breaking It Down: Estimating Short-Chain PFAS Half-Lives in a Human Population*, ENVIRON HEALTH PERSPECT. 2020;128(11):114002, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7657368/.

[17] Genuis SJ, Beesoon S, Birkholz D, Lobo RA., *Human excretion of bisphenol A: blood, urine, and sweat (BUS) study*, J. ENVIRON PUBLIC HEALTH, 2012;2012:185731, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3255175/.

industrial users. But, what all PFAS share is that they contain multiple carbon-fluorine bonds, considered one of the strongest in chemistry, making them highly persistent in the environment and in human and animal bodies. In addition, the shared, characteristic chemistry common to all PFAS confers on each of these compounds hydrophobic and oleophobic properties, making PFAS effective surface protectors.[18]

56.    PFAS are extremely soluble in water, which has led to their discovery in groundwater, rivers, and the ocean, as well as drinking water resources, fish, and marine mammals.

57.    PFAS can be categorized as either "long-chain" or "short-chain" based on the number of carbon atoms they contain. Long-chain PFAS contain 7 or more carbon atoms, while PFAS containing fewer than 7 carbon atoms are considered short chain.

58.    Long-chain PFAS such as perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS) have been widely detected in environmental samples, wildlife, and humans across the globe. Long-chain PFAS bioaccumulate and bio-magnify in both humans and in wildlife.

59.    In the Stockholm Convention on Persistent Organic Pollutants, PFOS is listed in Annex B. Annex B consists of persistent organic pollutants whose production, use, import, and export the Convention aims to restrict.

60.    The European Union specifically regulates products containing PFAS, restricting the manufacture or import of products containing more than 25 parts per billion (ppb) of PFOA.

---

[18] *See* Per- and Polyfluoroalkyl Substances (PFAS), Nat'l Toxicology Program, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html.

61.    In October 2021, the US government announced its "PFAS Strategic Roadmap," which is an interagency plan to combat the continued use and release of PFAS. As part of the Strategic Roadmap, the Environmental Protection Agency (EPA) committed to designating PFOA and PFOS as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); finalizing a PFAS reporting rule under the Toxic Substances Control Act (TSCA) section 8(e); and publishing toxicity assessments for 7 widely-used PFAS, including the short-chain compound GenX, PFBA, PFHxA, PFHxS, PFNA, and PFDA.

62.    Following announcement of the Strategic Roadmap, a majority of the EPA's Science Advisory Board (SAB) agreed with the EPA that PFOA is a "likely carcinogen," with some members supporting a designation of "carcinogen." For PFOS, the SAB indicated that the evidence supports a label of "likely carcinogen."

63.    Short-chain PFAS unfortunately pose health and safety risks that are similar to their long-chain counterparts.

64.    Short-chain PFAS consist of multiple carbon-fluorine bonds, which, like long-chain PFAS, makes them highly persistent in the environment. They also bioaccumulate in human and animal bodies.

65.    A 2019 study conducted by the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as long-chain compounds. This study determined that both long and short-chain PFAS compounds affect the same organ systems, with the greatest impact observed in the liver and thyroid hormone.[19]

---

[19] *Id.*

66.     Humans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increase after application to skin.[20]

67.     Many PFAS, both long and short chain, are toxic to humans at extremely low levels. Exposure to certain PFAS is associated in the medical and scientific literature with harmful and serious health effects in humans and animals, including but not limited to: (a) altered growth; (b) impacts to learning and behavior of infants and older children; (c) lowering a woman's chance of getting pregnant; (d) interference with the body's natural hormones; (e) increased cholesterol levels; (f) modulation of the immune system; (g) testicular and kidney cancers; (h) thyroid disease; (i) high uric acid levels; (j) elevated liver enzymes; (k) ulcerative colitis; and (l) pregnancy-induced hypertension.

68.     The International Agency for Research on Cancer (IARC) has classified PFOA as possibly carcinogenic to humans.[21]

69.     There is also evidence in the scientific literature that PFAS exposure is positively correlated with certain metabolic diseases, such as diabetes, overweight, obesity, and heart disease.

---

[20] Hillary L. Shane, Rachel Baur, Ewa Lukomska, Lisa Weatherly, Stacey E. Anderson, *Immunotoxicity and allergenic potential induced by topical application of perfluorooctanoic acid (PFOA) in a murine model*, Food and Chemical Toxicology, Vol. 136 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0278691520300016.
.
[21] *See* World Health Organization, *Perfluorooctanoic acid*, https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono110-01.pdf.

70.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to PFAS may impact the immune system and reduce antibody response to vaccines.[22] This is especially significant given the current public health risks posed by COVID-19 and efforts to protect against the virus with vaccines.

71.     PFAS are capable of crossing the placenta, meaning pregnant women transfer PFAS to their unborn children. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections.

72.     Research by professors at Harvard's T.H. Chan School of Public Health shows that babies breastfed by mother's exposed to PFAS suffer significant consequences:[23]

> "They found that, in children who were exclusively breastfed, PFAS concentrations in the blood increased by roughly 20%–30% each month, with lower increases among children who were partially breastfed. **In some cases, by the end of breastfeeding, children's serum concentration levels of PFASs exceeded that of their mothers'**."

73.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health":[24]

---

[22] *What are the health effects of PFAS?,* Agency for Toxic Substances and Disease Registry (June 24, 2020), https://www.atsdr.cdc.gov/pfas/health-effects/index.html.
[23] Harvard T.H. Chan Sch. of Pub. Health, *Breastfeeding may expose infants to toxic chemicals* (Aug. 20, 2015), https://www.hsph.harvard.edu/news/press-releases/breastfeeding-may-expose-infants-to-toxic-chemicals/ (emphasis added).
[24] *Emerging chemical risks in Europe — 'PFAS'*, EUR. ENV'T AGENCY (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



74.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[25]

75.     The danger of PFAS is well known. On September 20, 2020, a New York Times article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies" reported on the dangers of PFAS—particularly during gestation and in early childhood development:[26]

---

[25] *Id.*

[26] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020), https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxinschemicals.html.

**Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.**

More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity. Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure. Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

76.     Additionally, according to the EEA:[27]

Costs to society arising from PFAS exposure are high, with the annual health related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019). The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.

77.     This analysis has yet to be performed in the United States of America; however, there is no reason to believe the conclusions would differ.

78.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3)

---

[27] EEA, *supra* note 24.

encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[28]

79.     Researchers have begun to find significant increases of certain short-chain PFAS in the blood of sample populations, raising concerns that short-chain PFAS are assuming the body burden once exclusively occupied by long-chain compounds.

80.     Consumers are rightfully concerned about the presence or risk of PFAS in various products.

81.     However, PFAS are essentially unregulated at the federal level. For example, the Safe Drinking Water Act ("SDWA") protects public water supplies across the U.S. and is enforced by the Environmental Protection Agency (EPA). Under this law, the EPA has not (although it could) formally created a Maximum Contaminant Level for PFAS in the water supply. Rather, the EPA has issued a health advisory for PFOA and PFOS that serve as "informal technical guidance" to assist government officials and water system managers in sampling and treating PFOA and PFOS in drinking water.[29]

82.     Over the past decade, several states have enacted maximum contaminant levels regulating certain PFAS, including PFOA and PFOS, in drinking water.

83.     California has been on the forefront of enacting legislation to manage and lessen the health and safety risks of PFAS for its citizens.

---

[28] Arlene Blum et al., *The Madrid Statement*, GREEN SCI. POL'Y INST., https://greensciencepolicy.org/our-work/science-policy/madrid-statement/.
[29] *PFAS Laws and Regulations*, U.S. Environmental Protection Agency, https://web.archive.org/web/20210325235307/https://www.epa.gov/pfas/pfas-laws-and-regulations.

84.     The California Office of Environmental Health Hazard Assessment (OEHHA), for example, has proposed a Public Health Goal for PFOA in drinking water of 0.007 parts per trillion (ppt) and a Public Health Goal for PFOS of 1 ppt.[30]

85.     California Health and Safety Code 116378 provides that the state can order public water systems to monitor for PFAS. California's Proposition 65 requires products to carry a warning that they contain PFOA and PFOS if they are sold in California and, if not, private enforcement action is permitted. In 2020, California began requiring public water suppliers to notify customers if their water contains PFAS.

86.     In October 2020, California passed a law titled the Toxic Free Cosmetics Act, Assembly Bill 2762, that, starting January 1, 2025, will prohibit the manufacturing or selling of any cosmetic product with any intentionally added amount of 24 specified chemicals, including PFAS.

87.     In March 2021, California's OEHHA released a Notice of Intent to list PFOA as a carcinogen under Proposition 65. In December 2021, the OEHHA approved the listing of PFOS as a carcinogen under Proposition 65.

88.     California recently passed legislation banning the use of PFAS in paper-based food packaging as well as the disclosure of the presence of PFAS in cookware.[31]

---

[30] *Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS) in Drinking Water*, California Office of Environmental Health Hazard Assessment (Oct. 5, 2021), https://oehha.ca.gov/water/report/perfluorooctanoic-acid-pfoa-and-perfluorooctane-sulfonic-acid-pfos-drinking-water.

[31] Avinash Kar, *CA Bill to Reduce Toxic PFAS Exposures Passed by Legislature*, Natural Resources Defense Council (Sep. 7, 2021), https://www.nrdc.org/experts/avinash-kar/ca-bill-reduce-toxic-pfas-exposures-passed-legislature.

This bill, Assembly Bill 1200, builds off similar food-packaging legislation passed in 2020 in New York.[32]

89.     The State of New York was one of the first to recognize that PFAS were harmful to humans and should be regulated. In 2016, it took steps to regulate when and how PFAS could knowingly be released into the environment, for example for firefighting purposes.[33] Then, in 2020, New York enacted a law prohibiting the sale of food packaging containing PFAS, effective Dec. 31, 2022.[34]

90.     Similarly, in July of 2021, the State of Connecticut signed a bill into law banning the use of firefighting foam and food packaging that contains PFAS.[35] An even broader law was passed in Maine in July 2021 that bans PFAS in nearly all products, stating as of Jan. 1, 2030, "a person may not sell, offer for sale or distribute for sale" in Maine products where PFAS has been "intentionally added" except in cases of "unavoidable use."[36] Similar legislation has also been passed in Vermont and Washington.[37]

---

[32] *Id.*

[33] *Per- and Polyfluoroalkyl Substances (PFAS)*, Department of Environmental Conservation,  https://www.dec.ny.gov/chemical/108831.html.

[34] *New York Bans PFAS in Food Packaging*, National Law Review, Volume X, Number (Dec. 15, 2020), https://www.natlawreview.com/article/new-york-bans-pfas-food-packaging.

[35] *Governor Lamont Signs Legislation Banning Use Of PFAS-Containing Firefighting Foam in October, Phases Out PFAS-Containing Food Packaging In 2023*, The Office of Govenor Ned Lamont (Jul 20, 2021), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2021/07-2021/Governor-Lamont-Signs-Legislation-Banning-Use-Of-PFAS.

[36] Sebastien Malo, *Maine outlaws PFAS in products with pioneering law*, REUTERS (Jul. 16, 2021), https://www.reuters.com/legal/litigation/maine-outlaws-pfas-products-with-pioneering-law-2021-07-16/.

[37] *Connecticut and Vermont Ban PFAS in Food Packaging*, NATIONAL LAW REVIEW, Volume XI, Number 182 (Jul. 1, 2021),

91.     In 2018, 3M reached an $850 million settlement with the State of Minnesota brought by the Attorney General alleging that 3M's production of PFAS damaged the drinking water and resources throughout the Minneapolis/St. Paul area, including within residential areas.[38]

92.     A similar personal injury case was filed on behalf of citizens of West Virginia against DuPont related to discharges of PFAS from a manufacturing site into local water sources. That case settled in 2017 for $671 million.[39]

93.     In 2021, DuPont, Chemours and Corteva reached a $4 billion settlement over PFAS liabilities,[40] in addition to a $83 million settlement with plaintiffs in Ohio for personal injury claims.

94.     As the risks associated with PFAS become more widely known, it is likely that consumer awareness will continue to grow. It is reasonable for consumers to be concerned about these chemicals, which carry significant health risks and are often undisclosed by manufacturers.

### D.     The Use of PFAS in Food Packaging

---

https://www.natlawreview.com/article/connecticut-and-vermont-ban-pfas-food-packaging.

[38] Minnesota 3M PFAS Settlement, https://3msettlement.state.mn.us/.

[39] Arathy S Nair, *DuPont settles lawsuits over leak of chemical used to make Teflon*, REUTERS (Feb. 13, 2017), https://www.reuters.com/article/us-du-pont-lawsuit-west-virginia/dupont-settles-lawsuits-over-leak-of-chemical-used-to-make-teflon-idUSKBN15S18U.

[40] *DuPont, Chemours and Corteva Reach $4 Billion Settlement on 'Forever Chemicals' Lawsuits*, EWG (Jan. 22, 2021), https://www.ewg.org/news-insights/news-release/dupont-chemours-and-corteva-reach-4-billion-settlement-forever-chemicals.

95.     PFAS have been used in food packaging since the 1940s due to their water-resistant and grease-resistant properties.[41]

96.     PFAS that are in food packaging have been shown to migrate into the food.[42]

97.     As Justin Boucher of The Food Packaging Forum summarizes: "[w]e know that that these substances migrate into food that you eat. It's clear, direct exposure."[43]

98.     Migration from packaging into the food item "increases with higher temperatures, longer contact time, and the presence of emulsifiers."[44]

99.     Further, migration is more likely to occur where foods have high levels of fat and sodium.[45]

100.    All of these factors are present in fast food environments including at Defendant's restaurants.

101.    For decades, Burger King has been under fire for high levels of sodium and fat in its food items.[46]

---

[41] Ramírez Carnero A, Lestido-Cardama A, Vazquez Loureiro P, Barbosa-Pereira L, Rodríguez Bernaldo de Quirós A, Sendón R., *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, FOODS. 2021; 10(7):1443, http://www.mdpi.com/2304-8158/10/7/1443

[42] T. H. Begley, W. Hsu, G. Noonan & G. Diachenko (2008) *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*, FOOD ADDITIVES & CONTAMINANTS: PART A, 25:3, 384-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784.

[43] Loria, *supra* note 13.

[44] Begley, *supra* note 42.

[45] Ramírez, *supra* note 41.

[46] *See, e.g.,* Maia Appleby, *Are Burger King Whoppers Healthy?*, SF GATE (Dec. 7, 2018). https://healthyeating.sfgate.com/burger-king-whoppers-healthy-5386.html.

102. Studies show that consumption of restaurant food and popcorn is associated with higher blood concentrations of PFAS that is attributed to migration from food packaging.[47]

103. The presence of PFAS in food packaging is not incidental; rather, it is intentional.

104. As noted by Dr. Rainer Lohmann, "If a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."[48]

105. Alternatives to using PFAS exist, but they come at higher costs for food companies.[49]

106. In pursuit of higher profits, some restaurants – like Burger King– cut corners by using PFAs to the detriment of consumers and the public.

107. This "profits over people" approach passes the costs from Burger King and places it on Burger King's customers and the general public.

108. Rather than pay increased costs of a few cents per unit, Burger King shifts these costs to consumers throughout the United States.

109. The costs will ultimately be paid by multiple generations of Americans with health and environmental ailments caused by exposure to PFAS.

---

[47] Susmann, H.P.; Schaider, L.A.; Rodgers, K.M.; Rudel, R.A. *Dietary habits related to food packaging and population exposure to PFASs.* ENVIRON. HEALTH PERSPECT. 2019, 127, 107003, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092.

[48] Joe Fassler, *The bowls at Chipotle and Sweetgreen are supposed to be compostable. They contain cancer-linked "forever chemicals.",* THE COUNTER (Aug. 5, 2019), https://thecounter.org/pfas-forever-chemicals-sweetgreen-chipotle-compostable-biodegradable-bowls/.

[49] OECD (2020), *PFASs and Alternatives in Food Packaging (Paper and Paperboard) Report on the Commercial Availability and Current Uses*, OECD Series on Risk Management, No. 58, Environment, Health and Safety, Environment Directorate, OECD., https://www.oecd.org/chemicalsafety/portal-perfluorinated-chemicals/PFASs-and-alternatives-in-food-packaging-paper-and-paperboard.pdf; Pat Rizzuto, *PFAS in Food Packaging Driven by Costs of Substitutes, OECD Says*, Bloomberg Law (Sept. 25, 2020), https://news.bloomberglaw.com/environment-and-energy/pfas-in-food-packaging-driven-by-costs-of-substitutes-oecd-says.

E.    **Defendant's Misrepresentations and Omissions Are Actionable**

110.    Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

111.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers as they have already deceived and misled the Plaintiff and the Class Members.

112.    Defendant misrepresents that its Products are safe when they contain dangerous PFAS.

113.    This is not only implied by Defendant selling a food item but also through a widescale marketing campaign and brand that expresses food safety.

114.    The presence of PFAS in the Products has been confirmed by multiple studies including studies published as recently as March 2022.

115.    Further, for many decades, Defendant concealed its use of PFAS in the Products.

116.    These misrepresentations and omissions were done to increase Defendant's profits.

117.    Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of PFAS, and Defendants failed to warn or misrepresented this fact to consumers. Such illegally sold Products are worthless and have no value.

118.    Plaintiff and Class Members bargained for food products that are free of contaminants and dangerous substances and were deprived the basis of their bargain when Defendants sold them a product containing dangerous PFAS, which rendered the Products unmerchantable and unfit for use.

119.    No reasonable consumer would expect that a product marketed as safe would contain dangerous PFAS—which scientific studies indisputably link to

harmful health effects in humans. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

120.    As the Products expose consumers to PFAS that pose a risk to both consumers' health and the environment, the Products are not fit for use by humans. Plaintiff and the Class Members are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

121.    As alleged herein, Plaintiff and the Class Members received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for the Products, which were supposed to be safe for human consumption, but Plaintiff and the Class Members received Products that were unsafe for human consumption due to the presence of dangerous PFAS.

122.    Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

123.    Plaintiff seeks to recover damages because the Products are adulterated, defective, worthless, and unfit for human use due to the presence of PFAS.

## CLASS DEFINITIONS AND ALLEGATIONS

124.    Plaintiff, pursuant to Federal Rule of Civil Procedure 23, brings this action on behalf of the following classes (collectively, the "Class," "Classes," and "Class Members"):

a. Multi-State Consumer Class: All persons in the States of California, Florida, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, Pennsylvania, Oregon, and Washington who purchased the Products.[50]

b. Florida Class: All persons who purchased Defendant's Product within the State of Florida and within the applicable statute of limitations.

c. Nationwide Class: All persons who purchased Defendant's Product within the United States and within the applicable statute of limitations period.

125.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Product for resale, all

---

[50] The States in the Multi-State Consumer Class are limited to those States with similar consumer protection laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. 407.010, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); Pennsylvania (73 Pa. Stat. Ann. §§ 201-1 et seq.); Oregon (Or. Rev. Stat. §§ 646.605, et seq.); and Washington (Wash Rev. Code § 19.86.010, et seq.).

persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof.

126.     The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, over one hundred million units of the Products to Class Members.

127.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

     d.  whether Defendant misrepresented material facts concerning the Products;

     e.  whether Defendant omitted material facts concerning the Products;

     f.  whether Defendant's conduct was unfair and/or deceptive;

     g.  whether Defendant has been unjustly enriched as a result of the unlawful, deceptive, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiff and the Class;

     h.  whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

     i.  whether Defendant breached express and implied warranties to Plaintiff and the Class; and

j.   whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

128.   Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products and sustained damages from Defendant's wrongful conduct.

129.   Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions.

130.   Plaintiff has no interests which conflict with those of the classes.

131.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

132.   The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the

28

classes, thereby making appropriate equitable relief with respect to the classes as a whole.

133.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

134.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the presence or risk of PFAS in the Products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding the Products and could not reasonably discover that they contained PFAS.

135.    Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the presence or risk of PFAS in the Products. As alleged herein, the presence or risk of PFAS was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Members of the Class would not have discovered through the existence of reasonable diligence that the Products contain PFAS.

136.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Products and

to disclose the presence of PFAS due to its exclusive and superior knowledge of the contents and ingredient sourcing for the Products.

137.    Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendant's knowing, active, and affirmative concealment.

For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statues of limitations in defense of this action.

## CAUSES OF ACTION

### COUNT I
### Violation of State Consumer Protection Statutes
### (On Behalf of the Multi-State Consumer Class)

138.    Plaintiff repeats and realleges each and every allegation above as if set forth herein.

139.    The Consumer Protection Acts of the States in the Multi-State Consumer Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

140.    Defendant intended that Plaintiff and the other members of the Multi-State Consumer Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

141.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff, and other members of Multi-State Consumer Class, have sustained damages in an amount to be proven at trial.

## COUNT II
## Breach of Express Warranty
## (On Behalf of the Nationwide Class)

142.    Plaintiff brings this count on behalf of herself and the Nationwide Class and repeats and realleges paragraphs 1-137, as if fully included herein.

143.    Defendant marketed, sold, and/or distributed the Products, and Plaintiff and Class Members purchased the Products.

144.    Defendant is a "merchant" and the Products are "goods" as defined under the U.C.C.

145.    There was a sale of goods from Defendant to Plaintiff and Class Members.

146.    Defendant represented in its marketing, advertising, and promotion of the Products that its Products provided a safe means of food consumption for consumers, and failed to disclose that the Products posed serious safety risks to consumers.

147.    Defendant made these representations to induce Plaintiff and Class Members to purchase the Products, which did in fact induce Plaintiff and Class Members to purchase these Products.

148.    Accordingly, Defendant's representations and omissions that the Products were safe, while refusing to disclose the serious safety risks posed by the Products to consumers, formed a part of the bargain between Defendant and Plaintiff and Class Members.

149.    The Products did not conform to Defendant's representations and warranties that the Products were safe for consumers because at all times relevant the Products posed serious, continuous safety risks to consumers.

150.    As a direct and proximate result of Defendant's breaches of its express warranties and its failure to conform to the Products' express representations, Plaintiff and Class Members have been damaged. Plaintiff and Class Members have suffered damages in that they did not receive the safe product they specifically paid for and that Defendant warranted the Products to be.

## COUNT III
### Breach of the Implied Warranty of Merchantability
### (On Behalf of the Nationwide Class)

151.    Plaintiff brings this count on behalf of herself and the Nationwide Class and repeats and realleges paragraphs 1-137, as if fully included herein.

152.    Defendant is a "merchant" and the Products are "goods" as defined under the U.C.C.

153.    There was a sale of goods from Defendant to Plaintiff and Class Members.

154.    At all times mentioned herein, Defendant manufactured, distributed, marketed, and sold the Products, and prior to the time such products were purchased by Plaintiff and the Class Members, Defendant impliedly warranted to them that the Products were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made that the Products were safe for consumption.

155. Plaintiff and the Class Members relied on Defendant's promises and affirmations of fact when they purchased the Products.

156. The Products were not fit for their ordinary use, consumption by people, and did not conform to Defendant's affirmations of fact and promises as they contained high, dangerous amounts of PFAS.

157. Defendant breached its implied warranties by selling the Products that failed to conform to the promises or affirmations of fact made concerning each Product because they contained dangerous PFAS.

158. Defendant was on notice of these breaches because it had knowledge of the defect because it intentionally included the PFAS into the Products.

159. Further, Plaintiff notified Defendant of these breaches through an email from counsel prior to the filing of this lawsuit.

160. Privity exists because Defendant sold the Products to the Plaintiff and Class Members. Further, Defendant expressly warranted to Plaintiff and the Class Members that the Products were safe for consumption, which was untrue as described hereinabove. Defendant knew that consumers such as Plaintiffs and the Class Members would be the end purchasers of the Products and the target of their marketing. Defendant intended its marketing to be considered by the end purchasers of the Products, including Plaintiff and the Class Members. Defendant directly marketed to Plaintiff and the Class Members.

161. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered actual damages in that they have purchased the

Products which are worth less than the price they paid and that they would not have purchased at all had they known of the presence of dangerous PFAS.

162.   Plaintiff and the Class Members seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their implied warranties and resulting breach.

**COUNT IV**
**Florida Deceptive and Unfair Trade Practices Act**
**("FDUTPA"), Fla. Stat. § 501.201 et seq.**
**(In the Alternative to Count I and on behalf of the Florida Class)**

163.   Plaintiff brings this count on behalf of herself and the Florida Class and repeats and realleges paragraphs 1-137, as if fully included herein.

164.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, et seq. The stated purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). 103.

165.   Plaintiff and Class Members are "consumers," and the transactions at issue in this Complaint constitute "trade or commerce," as those terms are defined in Fla. Stat. § 501.203(7)- (8).

166.   FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

167.    Defendant manufactures, distributes, markets, advertises, and sells the Products.

168.    The Products are "goods" within the meaning of FDUTPA.

169.    For the reasons discussed herein, Defendant violated and continues to violate FDUTPA by engaging in the conduct described herein, which are unconscionable, deceptive, unfair acts or practices proscribed by FDUTPA. Defendant's acts and practices, including their omissions, were likely to, and did, in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

170.    Defendant engaged in the following unconscionable, unfair, deceptive, and unconscionable practices:

      a.  Defendant manufactured, distributed, marketed, advertised and sold the Products, which posed serious safety risks to consumers, and which serious safety risks existed when the Products left Defendant's control and at the point of sale;

      b.  Defendant knew, or otherwise should have known, that the Products posed serious safety risks to consumers, but failed to disclose or concealed these risks from consumers;

      c.  Defendant knew the serious safety risks posed by the Products were unknown to consumers, and would not be easily discovered by Plaintiff and Class Members, and would defeat their ordinary,

foreseeable and reasonable expectations concerning the performance of the Products;

d.  Defendant warranted that the Products are safe to consume, when, in fact, the Products pose serious safety risks to consumers; and

e.  Defendant represented to consumers, including Plaintiff and Class Members, that the Products are safe and fit for the use for which they were intended, despite the fact that Defendants knew, or otherwise should have known, that the Products were unsafe and unfit, posing serious safety risks to consumers.

171.  Defendant warranted and represented that the Products were safe and were suitable for their intended use. However, the Products, which are marketed as being consumed safely by customers, are unsafe as designed, manufactured, marketed, and sold. The Products posed serious, continuous safety risks to consumers.

172.  Defendant had exclusive knowledge of material facts concerning the serious safety risks posed by the Products to consumers.

173.  Defendant knew, or otherwise should have known, that the Products posed serious safety risks to consumers, including Plaintiff and Class Members, based upon: (1) their own internal testing and surveys, (2) independent testing and surveys, (3) numerous consumer complaints lodged directly with Defendant, (4) numerous consumer complaints on online fora, and (5) media reports, dating back over a decade.

174.    Despite Defendant's exclusive knowledge of material facts concerning the existence of the serious safety risks posed by Products, Defendant concealed the serious safety risks from consumers by failing to disclose the serious safety risks to consumers.

175.    Despite Defendant's exclusive knowledge of material facts concerning the existence of the serious safety risks posed by the Products, Defendant denied the existence of the serious safety risks to consumers.

176.    Plaintiff purchased the Products believing them to be safe based upon Defendant's representations about the Products. Plaintiff was unaware of the serious safety risks the Products posed to consumers at the time she purchased the Products and had no reason to know of these serious safety risks posed by the Products at the time of her purchase.

177.    Defendant's practices described herein were likely to deceive, and did deceive, consumers acting reasonably under the circumstances. Consumers, including Plaintiff and Class Members, would not have purchased the Products, or would have paid significantly less for them, had they known that the Products were not safe.

178.    Defendant's violations described herein present a continuing risk to Plaintiff and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

179.    As a result of Defendant's misconduct, Plaintiff and Class Members have been harmed and suffered actual damages in that they purchased the Products which are worthless and pose serious safety risks.

180.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff and Class Members have been damaged, and are entitled to recover actual damages to the extent permitted by law in an amount to be proven at trial.

181.    Plaintiff seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, and seeks attorneys' fees and any other just and proper relief available under FDUTPA and applicable law.

**COUNT V**
**Violation of the Magnusson-Moss Warranty Act,**
**15 U.S.C. §§ 2301 et seq. ("MMWA")**
**(On Behalf of the Nationwide Class)**

182.    Plaintiff brings this count on behalf of herself and the Nationwide Class and repeats and realleges paragraphs 1-137, as if fully included herein.

183.    Plaintiff and Class Members are "consumers" within the meaning of the MMWA. 15 U.S.C. § 2301(3).

184.    The Products are "consumer products" within the meaning of the MMWA. 15 U.S.C. § 2301(1).

185.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA. 15 U.S.C. § 2301(4)-(5).

186.    Defendant's express warranties are written warranties within the meaning of Section 2301(6) of the MMWA. The Products' implied warranties are

accounted for under Section 2301(7) of the MMWA. Defendant cannot disclaim implied warranties under the MMWA because Defendant knowingly sold a defective product without informing consumers about the defects.

187.   As set forth herein, Defendant breached its warranties with Plaintiff and Class Members.

188.   The Products share common defects in that they are unsafe and unfit for human consumption.

189.   Defendant had knowledge of these defects at the time the Products were delivered to Plaintiff and the Class Members because Defendant intentionally used PFAS in each Product.

190.   Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice concerning the defects described herein and consumers' experiences with the defects to both Defendant and retailer.

191.   As a direct and proximate result of Defendant's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

192.   The amount in controversy for the Plaintiff's and Class Members' individual claims meets or exceeds the sum of $25. The total amount in controversy of this action in sum exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

193.   Plaintiff and Class Members are entitled to recover damages as a result of Defendant's breach of warranties.

194.    Plaintiff and Class Members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

### COUNT VI
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

195.    Plaintiff brings this count on behalf of herself and the Nationwide Class and repeats and realleges paragraphs 1-137, as if fully included herein.

196.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Class.

197.    Plaintiff and members of the Class conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the Class were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

198.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

199. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

200. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d. For an order requiring Defendant to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For prejudgment and postjudgment interest on all amounts awarded;

f. For an order awarding punitive damages; and

g. For an order awarding attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

41

Dated this 14th day of April, 2022.

Respectfully submitted,

*/s/ Daniel D. Dolan, II*
Daniel D. Dolan, II, Esq.
Florida Bar No.: 84913
Dolan Dobrinsky Rosenblum Bluestein LLP
2665 South Bayshore Drive, Suite 603
Miami, Florida 33133
Telephone: (305) 371-2692
Facsimile: (305) 371-2691
Email: DDolan@DDRLawyers.Com
Attorneys for Plaintiff

and

*/s/ Steffan T. Keeton*
Steffan T. Keeton, Esq.
Pennsylvania Bar No.: 314635
(*pro hac vice forthcoming*)
The Keeton Firm LLC
100 S. Commons, Suite 102
Pittsburgh, PA 15212
Telephone: (888) 412-5291
Email: stkeeton@keetonfirm.com
Attorneys for Plaintiff